UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ART OF MANLINESS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-CV-493-CVE-JFJ |
| | ) | |
| URBANDADDY, INC. and | ) | |
| LANCE BROUMAND, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Now before the Court is the Opening Motion of Defendants UrbanDaddy, Inc. and Broumand to Dismiss for Lack of Personal Jurisdiction and Improper Venue, and Alternatively for Change of Venue, and Brief in Support (Dkt. # 13). Defendants UrbanDaddy, Inc. (UrbanDaddy) and Lance Broumand argue that they are not subject to personal jurisdiction in Oklahoma and they ask the Court to dismiss the case. In the alternative, they argue that the parties' contract contains a forum selection clause, and the case should be transferred to the United States District Court for the Southern District of New York pursuant to the forum selection clause. Dkt. # 13. Plaintiff Art of Manliness, LLC (AOM) responds that UrbanDaddy and Broumand knowingly entered into a long-term business relationship with an Oklahoma entity, and they are subject to personal jurisdiction in this Court. Dkt. # 21, at 6-7. As to the forum selection clause, AOM argues that the clause was contained only in an older contract that had expired, and the new version of the contract entered by the parties in 2017 did not contain a forum selection clause. Id. at 7. Defendants filed a reply. Dkt. # 26.

## I.

UrbanDaddy is a Delaware corporation with its principal place of business in New York, New York, and Broumand states that he is a citizen of New York for the purpose of diversity jurisdiction. Dkt. # 13, at 29. Broumand, the president of UrbanDaddy, states that UrbanDaddy "has had various internet websites, newsletters, and computer applications providing local and general, luxury men's lifestyle content . . . targeted to relevant audiences in the largest cities across the country . . . ." Id. at 30. UrbanDaddy does not regularly conduct or solicit business in Oklahoma, and does not have offices or employees in Oklahoma. Id. AOM is an Oklahoma corporation operating in Tulsa, Oklahoma, and AOM states that it manages a men's interest website from Tulsa. Dkt. # 21-1, at 1. Brett McKay, the president of AOM, resides in Tulsa, and he states that AOM has always conducted business from Tulsa. Id. at 1-2.

In July 2014, UrbanDaddy's head of business development, LeBaron Meyers, contacted McKay by sending a message on Linkedin seeking to discuss a potential partnership, and McKay was originally uninterested in the services offered by UrbanDaddy. Dkt. # 21-4, at 2-4. Despite McKay's lack of interest, representatives of UrbanDaddy continued to contact him and he agreed to have a phone conference on September 17, 2014 with Meyers and Karim Farag, a freelance contractor for Urban Daddy. Dkt. # 21-1, at 3. McKay remained in contact with Meyers and Farag over the next few months and, in January 2015, Meyers and Farag expressed interest in traveling to Tulsa to discuss a business relationship between UrbanDaddy and AOM. Id. at 4. Meyers and Farag flew to Tulsa in February 2015 and met with McKay, and this meeting led to negotiations for a contractual relationship between UrbanDaddy and AOM. Id. On March 10, 2015, UrbanDaddy submitted a proposed advertising and licensing agreement to McKay. Id. UrbanDaddy claims that

2

it conducted negotiations from its office in New York, and AOM states that the negotiations

occurred in Tulsa. Dkt. # 21-1, at 4. Dkt. # 13, at 33. UrbanDaddy claims that AOM's location in

Tulsa, Oklahoma was not relevant to UrbanDaddy's decision to enter a business relationship with

AOM, but by the time the parties entered contractual negotiations it is undisputed that UrbanDaddy

knew that AOM was based in and conducted business from Tulsa. See Dkt. # 13, at 10.

The parties entered a written agreement under which UrbanDaddy had the exclusive right

to "represent, manage and sell all of the Display Advertising and Sponsorships available" on AOM's

websites through December 31, 2016. Dkt. # 13, at 47. The agreement required AOM to maintain

a minimum monthly average of unique visitors to its website, and AOM also agreed to a minimum

number of "impressions," or views of advertisements, on a monthly and quarterly basis. Id. at 44.

UrbanDaddy agreed to pay AOM 50 percent of the net advertising revenue from the placement of

advertisements on AOM's websites., and the parties agreed to minimum quarterly payments to AOM

through the end of 2016. Id. at 45. The payments to AOM could be increased or decreased

depending on various factors, including the number of visitors to AOM's websites, the number of

impressions, and the click through rate (CTR). Id. at 45. The agreement gave AOM the right to

request an audit of UrbanDaddy's books and records by an independent certified accounting firm

if a dispute arose over the amount of UrbanDaddy's payments to AOM. Id. If either party wanted

to terminate the agreement before December 31, 2016, the party seeking to terminate the agreement

was required to provide notice in writing and give the other party 30 days to cure any alleged breach

of the agreement. Id. at 47. The agreement also provided that it could be terminated for the

bankruptcy of either party or if the CTR fell below a minimum standard for a three month time

period, but either party would be in breach of contract if they attempted terminate the agreement for

3

a reason not specified in Section 8 of the agreement.  Id.  The parties agreed that the "Agreement may be modified only by writing executed by a duly authorized company officer" and no course of dealing by the parties could waive this right.  Id. at 48.  The agreement also contains a choice of law provision selecting New York law, and the parties "irrevocably agree that any action at law or in equity arising out of or relating to these terms shall be filed only in state or federal courts located in New York County, New York and the parties hereby consent and submit to the personal jurisdiction of such courts for the purposes of litigating any such action."  Id. at 49.

The agreement was executed by UrbanDaddy and AOM in March 2015, but it quickly became apparent to AOM that it would not be able to meet the minimum website traffic requirements of the agreement.  Dkt. # 21-1, at 5.  In August 2015, Urban Daddy agreed to make a one time exception to contractual requirements for the number of "impressions" and the CTR, but UrbanDaddy advised AOM that it could be penalized in 2016 if these numbers failed to improve.  Dkt. # 26, at 32.  In September 2015, McKay proposed eliminating the minimum quarterly payment and amending the CTR, and UrbanDaddy agreed to the proposed changes to the parties' agreement.  Id. at 35-36.   On November 22, 2015, UrbanDaddy sent an e-mail to McKay stating that UrbanDaddy's attorneys were reviewing a new draft of the parties' agreement and a subsequent e-mail sent by UrbanDaddy on December 28, 2015 shows that UrbanDaddy was open to renegotiating certain aspects of the parties' agreement.  Dkt. # 21-6.  McKay states that he believed that the Agreement had been so materially altered that the parties mutually understood that the original agreement was no longer in effect.  Dkt. # 21-1, at 6.  However, there is no evidence that either party invoked the termination procedure required by the agreement to terminate the contract, and the e-mails from UrbanDaddy do not show that there was a mutual understanding that the original

agreement had been terminated.  UrbanDaddy prepared amendments to the contract and sent the amendments to McKay, and the amendments left all portions of the original contract in effect that were not changed by the amendments.  Dkt. # 26, at 39. The copy of the amendments attached to UrbanDaddy's reply is unsigned and it does not appear that the parties formally executed the amendments to the contract.

McKay states that AOM was contemplating terminating its business relationship with UrbanDaddy and, on October 6, 2016, Broumand and Meyers traveled to Tulsa to make a sales pitch for continuation of the business relationship.  Dkt. # 21-1, at 6-7.  In an October 14, 2016 e-mail, Broumand wrote to McKay that he was not "looking to lock [AOM] into a contract" and he wanted to "figure out what the right thing to do is . . . ."  Dkt. # 21-7, at 2.  UrbanDaddy presented a 40 page powerpoint presentation to AOM in November 2016, and UrbanDaddy proposed a business relationship that essentially tracked the parties' existing contractual arrangement with some amendments.  Dkt. # 26, at 57-96.  Broumand followed up with McKay in a November 29, 2016 e-mail and stated that he was "not asking [AOM] to commit to us for any contract term," but Broumand noted that AOM would be receiving a third-quarter statement and payment pursuant to the existing contract within a few days.  Dkt. # 21-8, at 2.  McKay responded that AOM intended to reduce the amount of original content on its websites from one or two pieces per day to three pieces per week, and McKay wanted to know if Broumand would view AOM as a "valuable long-term partner" with this reduced amount of original content on its websites.  Dkt. # 13, at 76.  In a subsequent e-mail, McKay stated he still felt like AOM and UrbanDaddy had a "good partnership" and that the "only change with this shift of ours to the original plan (besides planning on less traffic) is that we wouldn't [be] up for doing underwritten sponsored content anymore . . . ."  Id. at 78.

The parties do not dispute that the original contract expired on December 31, 2016, but there is a significant dispute concerning the contractual arrangement underlying the parties' business dealings after December 31, 2016. McKay claims that the parties had a "2017 Agreement" that was not reduced to writing and the agreement was be reflected solely by the parties' conduct. Dkt. # 21-1, at 7. McKay's affidavit does not explain whether the parties agreed to any specific terms to govern their conduct or the parties had any binding contractual obligations to one another under the 2017 Agreement. Id. UrbanDaddy argues that the parties continued to operate under the original written agreement subject to certain agreed amendments, and UrbanDaddy states that it continued to make quarterly payments to AOM as required by the written agreement. Dkt. # 26, at 22. UrbanDaddy has also attached numerous e-mails to its reply showing that the parties' continued to comply with their obligations under the original written agreement in 2017 and 2018. Id. at 99-107. AOM alleges that UrbanDaddy failed to make quarterly payments beginning in the third quarter of 2017 and continuing through 2018 and, on December 7, 2018, McKay sent an e-mail to Broumand demanding that UrbanDaddy pay AOM $150,000 no later than December 12, 2018. Dkt. # 13, at 74. McKay also demanded an audit of UrbanDaddy's records and books if UrbanDaddy failed to pay the full amount demanded by McKay. Id. The parties' written agreement does provide both parties a contractual right to demand an audit of the other party's books and records, but there is no record of an oral agreement to this term. Id. at 45.

AOM alleges that UrbanDaddy failed to pay the amount owed under the parties' contract and, on July 12, 2019, AOM filed this case in Tulsa County District Court. AOM asserts claims of breach of contract (Count I), fraud (Count II), negligence (Count III), breach of fiduciary duty (Count IV), unjust enrichment (Count V), accounting and disgorgement (Count VI), and constructive

trust (Count VII), and AOM seeks damages in excess of $75,000.  Dkt. # 2, at 10-19.  UrbanDaddy removed the case to this Court and filed a motion to dismiss the case for lack of personal jurisdiction or to transfer venue based on the forum selection clause (Dkt. # 13).

## II.

Defendants argue that they do not have sufficient minimum contacts with Oklahoma for the Court to exercise personal jurisdiction over them and, even if minimum contacts exist, it would offend traditional notions of fair play and substantial justice for the Court to exercise personal jurisdiction over UrbanDaddy and Broumand.  Dkt. # 13, at 16.  AOM responds that UrbanDaddy initiated a long-term business relationship with an Oklahoma entity and had numerous contacts with Oklahoma, and UrbanDaddy and Broumand could reasonably have foreseen being sued in Oklahoma for claims arising out of this business relationship.  Dkt. # 21, at 17-19.

When a defendant moves to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the plaintiff bears the burden of establishing that the Court has personal jurisdiction over the defendant. OMI Holdings, Inc. v. Royal Ins. Co. of Canada, 149 F.3d 1086, 1091 (10th Cir. 1998). "When a district court rules on a Fed. R. Civ. P. 12(b)(2) motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, . . . the plaintiff need only make a prima facie showing of personal jurisdiction to defeat the motion." Id. (citations omitted).  "The plaintiff may make this prima facie showing by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over the defendant." Id. at 1091.  "In order to defeat a plaintiff's prima facie showing of jurisdiction, a defendant must present a compelling case demonstrating 'that the presence of some other considerations would render jurisdiction unreasonable.'" Id. (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985)).  The allegations of the complaint must

7

be accepted as true to the extent they are uncontroverted by a defendant's affidavit. Taylor v. Phelan, 912 F.2d 429, 431 (10th Cir. 1990). If the parties provide conflicting affidavits, all factual disputes must be resolved in the plaintiff's favor. Id.

For a court to exercise personal jurisdiction over a nonresident defendant in a diversity action, the plaintiff must demonstrate the existence of every fact required to satisfy both the forum's long-arm statute and the Due Process Clause of the United States Constitution. See OKLA. STAT. tit. 12, § 2004(F). "Because Oklahoma's long-arm statute permits the exercise of jurisdiction that is consistent with the United States Constitution, the personal jurisdiction inquiry under Oklahoma law collapses into the single due process inquiry." Intercon, Inc. v. Bell Atl. Internet Solutions, Inc., 205 F.3d 1244, 1247 (10th Cir. 2000) (citing Rambo v. Am. S. Ins. Co., 839 F.2d 1415, 1416 (10th Cir. 1988)); see also Hough v. Leonard, 867 P.2d 438, 442 (Okla. 1993).

"Due process requires that the nonresident defendant's conduct and connection with the forum state are such that the nonresident could reasonably anticipate being haled into court in that state." Conoco, Inc. v. Agrico Chem. Co., 115 P.3d 829, 835 (Okla. 2004) (citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)). "The Due Process Clause permits the exercise of personal jurisdiction over a nonresident defendant 'so long as there exist minimum contacts between the defendant and the forum State.'" Intercon, 205 F.3d at 1247 (quoting World-Wide Volkswagen, 444 U.S. at 291). The existence of such minimum contacts must be shown to support the exercise of either general jurisdiction or specific jurisdiction. Id. "When a plaintiff's cause of action does not arise directly from a defendant's forum related activities, the court may nonetheless maintain general personal jurisdiction over the defendant based on the defendant's business contacts with the forum state." Id. (citing Helicopteros Nacionales de Colombia v. Hall,

8

466 U.S. 408, 414-16 & n.9 (1984)).  Alternately, a court "may, consistent with due process, assert specific jurisdiction over a nonresident defendant 'if the defendant has purposefully directed his activities at the residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities.'" Id. (quoting Burger King Corp., 471 U.S. at 472).

AOM does not argue that the Court has general personal jurisdiction over UrbanDaddy, and the Court does not find that it could exercise general personal jurisdiction over UrbanDaddy.  In order to have general personal jurisdiction over a defendant, the defendant's contacts with the state must be so continuous and systematic that the defendant is "essentially at home in the State." Xmission, L.C. v. Fluent LLC, 955 F.3d 833, 840 (10th Cir. 2020).  AOM has offered no evidence that UrbanDaddy conducts business with any other Oklahoma entity and UrbanDaddy does not maintain an office in Oklahoma.  During 2015 and 2016, UrbanDaddy had about 80 employees and most of those employees resided in New York City.  Dkt. # 13, at 29.  Broumand states that AOM is the only Oklahoma entity with which UrbanDaddy has conducted business and that less than 0.1 percent of UrbanDaddy's annual audience traffic comes from Oklahoma.  Id. at 30.  AOM does not dispute that UrbanDaddy does not generally conduct business in Oklahoma and the Court finds that UrbanDaddy's contacts with Oklahoma are not so systematic and continuous that it could generally expect to be sued in Oklahoma.

AOM argues that UrbanDaddy could have reasonably expected to be sued in Oklahoma based on its business relationship with AOM, because this was a long-term business relationship between UrbanDaddy and AOM and UrbanDaddy had numerous contacts with Oklahoma as part of this business relationship.  The parties do not dispute that UrbanDaddy reached out to AOM and solicited AOM's business and, even if UrbanDaddy was not initially aware that AOM was based in

Tulsa, UrbanDaddy sent representatives to meet with McKay in Tulsa in February 2015.  Dkt. # 21-1, at 4.  As part of the contract negotiations, UrbanDaddy requested information about AOM's corporate status, and AOM advised UrbanDaddy that AOM was a limited liability company organized under the laws of Oklahoma with its principal place of business in Tulsa.  Dkt. # 21-5, at 2.  UrbanDaddy claims that it was not "relevant" to it that AOM was located in Oklahoma, but this does not change the fact that UrbanDaddy knew it was negotiating a potential business relationship with an Oklahoma entity.  Dkt. # 13, at 10.  UrbanDaddy does not dispute that numerous phone calls and e-mails were exchanged by representatives of UrbanDaddy and AOM during the negotiation process, but UrbanDaddy characterizes the negotiations as taking place from its office in New York.  Dkt. # 13, at 10.  This is not an accurate characterization of the evidence and AOM has shown that many of the communications between the parties, including the initiation of contract negotiations, were the result of UrbanDaddy purposefully reaching out to an Oklahoma business.  The Court also notes that many of e-mails from UrbanDaddy were personally sent by Broumand and the evidence shows that he was actively involved in the initial negotiations with AOM.

After the contract was executed, the parties communicated regularly by phone and e-mail and Broumand personally visited Tulsa after AOM expressed dissatisfaction with certain aspects of the parties' contractual arrangement.  Dkt. # 13, at 31; Dkt. # 21-1, at 6.  UrbanDaddy refers to Broumand's trip to Tulsa as a "customer relation trip" that has nothing to do with AOM's claims in this case, but the trip is evidence that Broumand personally visited Tulsa to further a business relationship with an entity based in Oklahoma.  See Dkt. # 13, at 18.  The Court must also consider the context of Broumand's trip to Tulsa, because AOM was considering ending its relationship with

UrbanDaddy.  UrbanDaddy sought to maintain its relationship with an Oklahoma business and Broumand actively participated in UrbanDaddy's efforts, and both UrbanDaddy and Broumand could have reasonably foreseen being sued in Oklahoma for claims arising out of the business relationship between UrbanDaddy and AOM.

In its reply, UrbanDaddy cites the Supreme Court's decision in <u>Walden v. Fiore</u>, 571 U.S. 277 (2014), for the proposition that a defendant's minimum contacts with a state must be based on the defendant's actions, not merely on a plaintiff's unilateral decision to create ties with a state.  Dkt. # 26, at 8.  In <u>Walden</u>, the defendant was a police officer who was working at an airport located in Atlanta, Georgia, and the plaintiffs were airline passengers flying from San Juan, Puerto Rico to Las Vegas, Nevada.  <u>Id.</u> at 279-80.  The plaintiffs had to catch a connecting flight in Atlanta, and agents of the Transportation Security Administration in San Juan notified law enforcement officials in Atlanta that a pre-flight search uncovered over $97,000 in cash in the plaintiffs' carry-on bags.  <u>Id.</u> at 280.  The defendant and a Drug Enforcement Agency (DEA) agent approached the plaintiffs at their departure gate to ask them about the money, and the plaintiffs claimed that they were professional gamblers and the cash was their gambling "bank."  <u>Id.</u>  The defendant seized the cash and allowed the plaintiffs to board their connecting flight, and he advised the plaintiffs that the money would be returned to them if their story could be confirmed.  <u>Id.</u>  The money was eventually returned to the plaintiffs, but the plaintiffs brought suit against the defendant in federal court in Nevada.  <u>Id.</u> at 281.  The district court dismissed the case for lack of personal jurisdiction, but that decision was reversed by the Ninth Circuit Court of Appeals.  The Supreme Court found that the focus must be on the defendant's conduct directed toward the forum state, and the plaintiff cannot be the sole link between the defendant and the forum state.  <u>Id.</u> at 285-86.  The defendant in <u>Walden</u>

did not engage in any conduct in Nevada or directed toward the state of Nevada, nor did he contact any person in Nevada or send any communications to any person in Nevada.  Id. at 288.  The sole link between the defendant and Nevada was the location of the plaintiff, and the mere fact that a forum resident allegedly sustained an injury does not show that the defendant had any significant contacts with the forum.  Id. at 289-90.

This is not a case where the plaintiff's unilateral decision to reside in a particular location is the sole link between the defendant and the forum state and Walden has no application.  As the Court has discussed, UrbanDaddy sought out a relationship with AOM and it was well aware that AOM was based in Oklahoma.  UrbanDaddy could have terminated contractual negotiations with AOM after learning that AOM was based in Oklahoma, but UrbanDaddy and Broumand made a voluntary and informed decision to pursue a relationship with an Oklahoma business.  AOM's physical presence in Oklahoma may not have originally been the reason for UrbanDaddy's contacts with Oklahoma, but UrbanDaddy's continued relationship with AOM created a link between it and the forum state that is not based solely on AOM's physical presence in the state.   The Court has already determined that UrbanDaddy and Broumand have sufficient minimum contacts with Oklahoma to support the exercise of personal jurisdiction over them, and defendants have not shown that AOM is the only link between defendants and the forum state.  Instead, defendants' actions directed toward the forum state provide the necessary connection allowing the Court to exercise personal jurisdiction over them.

As the Court has found that UrbanDaddy and Broumand have minimum contacts with Oklahoma,  the Court must now "consider whether the exercise of personal jurisdiction over the defendant offends 'traditional notions of fair play and substantial justice.'"  OMI Holdings, 149 F.3d

12

at 1091.  The touchstone of this analysis is whether the exercise of personal jurisdiction would be
"reasonable."  Id.  The determination of reasonableness "evokes a sliding scale: the weaker the
plaintiff's showing on [minimum contacts], the less a defendant need show in terms of
unreasonableness to defeat jurisdiction.  The reverse is equally true: an especially strong showing
of reasonableness may serve to fortify a borderline showing of [minimum contacts]."  Id. at 1092
(quoting Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 210 (1st Cir. 1994)).

        The Tenth Circuit has provided district courts five factors to consider in determining whether
exercise of personal jurisdiction would offend the traditional notions of fair play and substantial
justice.  The first factor is the burden on defendant of litigating in plaintiffs' chosen forum.  Id.  The
Tenth Circuit has said that "[t]his factor is of special significance, because it serves to prevent the
filing of vexatious claims in a distant forum where the burden of appearing is onerous."  Id. at 1096
(citing World-Wide Volkswagen, 442 U.S. at 292).  The second factor analyzes Oklahoma's interest
in resolving the parties' dispute.  OMI Holdings, 149 F.3d at 1095.  Oklahoma "generally has a
'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted
by out-of-state actors."  Burger King, 471 U.S. at 474 (quoting McGee v. Int'l Life Ins. Co., 355
U.S. 220, 223 (1957)).  The third factor examines "the plaintiff's interest in receiving convenient
and effective relief" in the forum state.  OMI Holdings, 149 F.3d at 1095.  "This factor may weigh
heavily in cases where a [p]laintiff's chances of recovery will be greatly diminished by forcing him
to litigate in another forum because of that forum's laws or because the burden may be so
overwhelming as to practically foreclose pursuit of the lawsuit."  Id. at 1097 (citing P. Atl. Trading
Co. v. M/V Main Express, 758 F.2d 1325, 1331 (9th Cir. 1985)).  The fourth factor concerns "the
interstate judicial system's interest in obtaining the most efficient resolution of controversies,"

which the Tenth Circuit has stated is the examination of "whether the forum state is the most efficient place to litigate the dispute."  Id.  "Key to the inquiry are the location of witnesses, where the wrong underlying the lawsuit occurred, what forum's substantive law governs the case, and whether jurisdiction is necessary to prevent piecemeal litigation."  Benton, 375 F.3d at 1079 (quoting OMI Holdings, 149 F.3d at 1097).  The fifth and final factor examines "the interests of the several states, in addition to the forum state, in advancing fundamental substantive social policies." OMI Holdings, 149 F.3d at 1097.

The Court initially notes that AOM has made a strong showing of minimum contacts and UrbanDaddy and Broumand must show that the factors significantly support a finding that it would offend traditional notions of fair play and substantial justice to require them to defend against AOM's claim in Oklahoma.  The first factor (burden on defendant) somewhat favors defendants. UrbanDaddy represents that it does not regularly conduct business in Oklahoma and that it would potentially have to shut down its office in New York to attend hearings in Oklahoma.  Dkt. # 13, at 18-19.  The second and third factors (forum state's interest and convenience for plaintiff) both support AOM's position that Oklahoma is an appropriate forum for this case. Defendants dispute that the forum state has any interest in adjudicating the dispute between the parties, because the parties agreed that New York law would apply and the agreement was executed by UrbanDaddy in New York.  Id. at 19.  However, there is no dispute that AOM is an Oklahoma entity with its principal place of business in Tulsa, and Oklahoma has a significant interest in providing a forum for its citizens to resolve legal disputes.  Dkt. # 21, at 22.  Defendants argue that there is no reason why AOM could not litigate its claims in New York, but they has not shown that it would be more convenient or effective for AOM to litigate its claims outside of Oklahoma.  The fourth factor

14

(interests of interstate judicial system) somewhat favors defendants.  Both AOM and defendants have identified witnesses located in their preferred forum and it will be inconvenient for some of the witnesses regardless of where the case proceeds.  As will be discussed below, the choice of law provision in the original agreement is part of the parties' implied contract and the courts of New York have a significant interest and expertise in applying New York law.  Finally, neither Oklahoma nor New York has a significant social policy that will be affected by resolution of this case.  As defendants note, this is a garden-variety breach of contract case and New York has a greater interest in applying its own laws to this dispute.  Dkt. # 13, at 20.  The Court finds that the five factors do not significantly favor either party and, combined with a strong showing of minimum contacts, the Court finds that it has personal jurisdiction over UrbanDaddy and Broumand.

## III.

Defendants argue that the parties' written agreement includes a forum selection clause requiring that any claims "arising out of or relating to the terms" of the parties' original agreement be filed in the state or federal courts located in New York County, New York, and defendants ask the Court to transfer this case to the United States District Court for the Southern District of New York.  Dkt. # 13, at 23-24.  AOM responds that the forum selection clause in the original agreement is unenforceable, because the forum selection clause was not part of the 2017 Agreement that governed the parties' relationship after December 31, 2016.  Dkt. # 21, at 26.

The Court must initially determine if the parties' agreement contains a venue selection clause or a forum selection clause. Unlike a forum selection clause, a venue selection clause authorizes, but does not require, litigation in certain forums and it may permit multiple acceptable forums for litigation.  SBKC Serv. Corp. v. 1111 Prospect Partners, L.P., 105 F.3d 578, 582 (10th Cir. 1997).

"The existence of a venue selection clause does not impose an absolute duty nor does it endow a party with an absolute right to have every dispute between the parties litigated in the named forum." Hospah Coal Co. v. Chaco Energy Co., 673 F.2d 1161, 1163 (10th Cir. 1982).  On the other hand, forum selection clauses are presumed to be valid and the burden is on the party resisting enforcement to show that enforcement of the clause would be unreasonable under the circumstances. Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 589 (1991); M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972); Milk 'N' More, Inc. v. Beavert, 963 F.2d 1342, 1346 (10th Cir. 1992). The party resisting enforcement of a forum selection clause "carries a heavy burden of showing that the provision itself is invalid due to fraud or overreaching or that enforcement would be unreasonable and unjust under the circumstances." Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d 953, 957 (10th Cir. 1992).  The Tenth Circuit has found that forum selection clauses fall into two general categories - mandatory or permissive.  Excell, Inc. v. Sterling Boiler & Mechanical, Inc., 106 F.3d 318, 321 (10th Cir. 1997).  A mandatory forum selection clause must contain "clear language showing that jurisdiction is appropriate only in the designated forum."  Id. (quoting Thompson v. Founders Group Int'l, 886 P.2d 904, 910 (Kan. Ct. App. 1994)).  A permissive forum selection clause permits suit to be brought in a particular jurisdiction, but does not prevent the parties from litigating in a different forum.  SBKC Serv. Corp., 105 F.3d at 581-82.  The Supreme Court has explained that the appropriate mechanism for the enforcement of a forum selection clause in federal court is 28 U.S.C. § 1404(a) through the doctrine of forum non conveniens.  Atlantic Marine Constr. Co., Inc. v. United States District Court for the Western Dist. of Texas, 571 U.S. 49, 60 (2013).  However, for cases in which the parties have selected another federal forum, Congress replaced the traditional remedy of dismissal with transfer to the selected forum.  Id.

16

In this case, the parties included choice of law and forum selection clauses in the original written agreement:

> Governing Law.  This Agreement shall be governed by the laws of the state of New York, without regard to the choice of law provisions thereof.  The parties hereby irrevocably agree that any action at law or in equity arising out of or relating to these terms shall be filed only in the state or federal courts located in New York County and the parties hereby consent and submit to the personal jurisdiction of such courts for the purposes of litigating any such action.

Dkt. # 13, at 49.  This provision contains language exclusively selecting a particular forum, rather than merely permitting litigation in a designated forum, and the clause prohibits litigation arising under or relating to the agreement in any forum other than the state or federal courts located in New York County.  This type of language of exclusivity shows that the parties intended for this to be a mandatory forum selection clause.  See Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC, 953 F.3d 660, 673 (10th Cir. 2020).

AOM argues that the original written agreement expired under its own terms and the parties entered a new agreement in 2017 that did not include a forum selection clause.  Dkt. # 21, at 26.  AOM states that the "present action arises from obligations under the 2017 Agreement that resulted from the parties' mutual agreement and understanding and by the parties' conduct after the Agreement terminated or, alternatively, expired."  Id.  Defendants do not dispute that the parties continued to operate under an agreement after the original written agreement expired, but they argue that the parties' relationship only makes sense if the terms of the original agreement remained in force.  Dkt. # 26, at 9.  McKay states that the "2017 Agreement was not reduced to writing, but was instead reflected by the parties' conduct."  Dkt. # 21-1.  Oklahoma law recognizes an implied contract "the existence and terms of which are manifested by conduct."  OKLA. STAT. tit. 15, § 133.

17

The Oklahoma Supreme Court has provided the following guidance to determine the existence and scope of an implied contract:

> When determining whether an implied contract exists, the Court will consider (a) the parties' acts, conduct and statements as a whole, (b) whether there was a meeting of the minds on the agreement's essential elements, (c) the parties' intent to enter into a contract upon defined terms, and (d) whether one of the parties has relied in good faith upon the alleged contract. While making its assessment, the Court is mindful of the legal principle that the law will not make for a party a better contract than it made itself or alter an agreement for one party's benefit and another's detriment. Lastly, we are also cognizant of the rule that an implied contract encompasses all provisions—discernible from the circumstances under which the agreement was reached—which are indispensable to effectuate the parties' intentions.

Dixon v. Bhuiyan, 10 P.3d 888, 891 (Okla. 2000). A court may consider the terms of any prior written contract between the parties to ascertain the terms and conditions of a subsequent contract implied by conduct. Id. at 892. New York law also recognizes that a "contract may be implied in fact where inferences may be drawn from the facts and circumstances of the case and the intention of the parties as indicated by their conduct." Ellis v. Provident Life & Accident Ins. Co., 3 F. Supp. 2d 399, 409 (S.D.N.Y. 1998). When a written agreement expires under its own terms, the parties can create an implied contract under substantially the same terms by continuing to provide services, accept services, or make payments as if the written agreement were still in effect. Nasdaq, Inc. v. Exchange Traded Managers Group, LLC, 431 F. Supp. 3d 176, 238 (S.D.N.Y. 2019).

The Court has reviewed the evidence submitted by AOM and finds that the terms of the "2017 Agreement" are too vague to constitute an enforceable contract unless the Court considers the terms of the original written agreement as an integral part of the subsequent implied contract. AOM offers no evidence outlining the terms of the implied contract, but it seems apparent that the parties' relationship continued to operate in a similar manner after the original agreement expired. McKay states that AOM expected to be paid on a quarterly basis for allowing UrbanDaddy to place

18

advertisements on AOM's websites, and this was the basic component of the parties' original agreement.  However, AOM also sought to enforce provisions of the original agreement after December 31, 2016, even though it has offered no evidence that the parties expressly agreed to these terms after the original agreement expired.  See Dkt. # 26, at 100 (September 7, 2017 e-mail from AOM requesting technical support from UrbanDaddy as authorized by Section 1(d) of written agreement); id. at 102 (July 3, 2018 e-mail referencing AOM's agreement to place no more than 3 advertisements on a single page); id. at 107 (December 6, 2018 e-mail showing that AOM would no longer comply with its obligations under Section 2(e) of the written agreement).  When demanding payment from UrbanDaddy, AOM invoked its right under Section 4(g) of the written agreement to audit UrbanDaddy's books and records.  Dkt. # 13, at 8.  The clear implication of the parties' conduct is that they were following the terms of the original agreement except for any changes that were specifically agreed upon by the parties, and there is no evidence suggesting that the parties completely abandoned the original agreement and formed a new contract.

The Court will give AOM the benefit of the doubt and assume that AOM has alleged a plausible breach of contract claim but, in order to do so, the Court must also assume that the implied contract was a continuation of the parties' original agreement.  The "2017 Agreement" referenced by AOM is simply too vague to constitute an enforceable contract without reference to the terms of the original agreement, and it is clear that AOM relied upon many aspects of the original agreement as the parties' relationship continued past December 31, 2016.  AOM cannot simply pick and choose aspects of the original agreement that it finds favorable and recast the contract as the "2017 Agreement," and AOM has offered no evidence that it specifically sought to re-negotiate or amend the choice of law or forum selection provisions of the original agreement.  The Court finds that the

19

implied contract governing the parties' relationship after December 31, 2016 includes all provisions of the original agreement that were not specifically amended by the parties, and the forum selection clause in the original agreement is enforceable.  AOM agreed to litigate "any action in law or in equity arising out of or relating to" the original agreement in the state or federal courts located in New York County, New York.  The Court has reviewed AOM's petition and all of AOM's claims relate to the business relationship governed by the parties' contractual agreement.  The forum selection provision agreed to by the parties is very broad and encompasses claims "arising under or relating to" the agreement, and all of AOM's claims arise under the agreement or relate to the parties' obligations under the terms of the contract. The Court will enforce the forum selection clause and transfer this case to the United States District Court for the Southern District of New York.

**IT IS THEREFORE ORDERED** that Opening Motion of Defendants UrbanDaddy, Inc. and Broumand to Dismiss for Lack of Personal Jurisdiction and Improper Venue, and Alternatively for Change of Venue, and Brief in Support (Dkt. # 13) is **granted in part and denied in part**: defendants' request to dismiss the case for lack of personal jurisdiction is denied, but defendants' motion to transfer venue based on a forum selection clause is granted.

**IT IS FURTHER ORDERED** that the Court Clerk is directed to **transfer** this case to the United States District Court for the Southern District of New York.

**DATED** this 11th day of August, 2020.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE